# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ARKADIY L. KHOLYAVSKIY,
                **Petitioner,**

      **v.**                                   **Case No. 05C0671**

LIEUTENANT MARK SCHLECHT,
et al.,
                **Respondents.**

## DECISION AND ORDER

      Pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, petitioner

Arkadiy Kholyavskiy seeks reimbursement for fees and costs incurred in connection with

a habeas corpus action in which he challenged the legality of his detention by Immigration

and Customs Enforcement ("ICE"), a subagency of the U.S. Department of Homeland

Security.

## I.  FACTS AND BACKGROUND

      In 1992, petitioner, then fifteen, entered the United States with his family as a

Jewish refugee from the former Soviet Union.   Subsequently he became a lawful

permanent resident of this country.  Petitioner presently suffers from mental illness (social

anxiety disorder and depression), and the Social Security Administration has determined

that he is disabled.  Petitioner has also been convicted of several criminal offenses.  As a

result of such convictions, ICE decided to deport him to Russia, and in August 2004,

detained him pending removal.[1]  However, in January 2005, Russian officials advised ICE

---

      [1]"Removal" refers to the expulsion of an alien from the United States.  <u>See, e.g.</u>, 8
U.S.C. § 1228(a).

that Russia did not regard petitioner as a Russian citizen and would not admit him. Nevertheless, ICE continued to detain petitioner.

Petitioner pursued relief through administrative channels unsuccessfully, and on June 22, 2005, pursuant to 28 U.S.C. § 2241, filed a petition for habeas corpus in this court.[2]  Petitioner named as respondents his immediate custodian, Lieutenant Mark Schlecht;  Kenosha County Sheriff David Beth; and Chicago ICE Field Office Director Deborah Achim.

To facilitate discussion of some of the issues presented by petitioner's EAJA application, I will briefly summarize the law relating to petitioner's detention and its intersection with the facts of the present case.  Generally speaking, ICE may detain a deportable alien while removal proceedings are pending.  Denmore v. Kim, 538 U.S. 510, 531 (2003).  After a removal order becomes final, ICE must detain the alien until he is removed, for up to ninety days (the "removal period").  8 U.S.C. § 1231(a)(2); see also Zadvydas v. Davis, 533 U.S. 678, 682 (2001).  Although § 1231(a)(6) appears to authorize discretionary indefinite detention of a removable alien beyond such period, the Supreme Court has indicated that indefinite detention would raise serious constitutional issues. Thus, the Court found that the statute permits ICE to detain an alien beyond the removal period only as long as reasonably necessary to bring about his removal and that "once removal is no longer reasonably forseeable, continued detention is no longer authorized."

---

[2]Petitioner previously filed a habeas petition in the Northern District of Illinois. However, the court dismissed the petition for lack of personal jurisdiction because petitioner failed to name the proper respondent, the person exercising custody over him at the Kenosha County Jail.  The Seventh Circuit subsequently affirmed.  Kholyavskiy v. Achim, 443 F.3d 946 (7th Cir. 2006).

2

Id. at 689, 699.  The Court further stated that detention beyond six months after the issuance of a final removal order is presumed unconstitutional but that the government can rebut the presumption by establishing that removal is reasonably forseeable.  Id. at 701.

In the present case, petitioner argued in his habeas petition that ICE had detained him for an excessive length of time and that because Russia had refused to admit him, his removal was not reasonably forseeable.  Accordingly, he contended his detention was distinguishable from that in Kim, and under Zadvydas, it violated his right to due process. Respondents countered that I lacked jurisdiction to hear the petition because petitioner's appeal from the Northern District of Illinois's dismissal of his previous petition was pending in the Seventh Circuit[3] and that because removal proceedings were pending, Zadvydas did not apply.

On September 7, 2005, the Board of Immigration Appeals ("BIA") issued a final order of removal.  Thus, the removal period expired on December 7, 2005.  ICE did not remove petitioner by that date, and thus, under Zadvydas, could continue to detain him only if his removal was reasonably forseeable.  On December 28, respondents advised me that ICE had made a second request to Russia to admit petitioner and that they planned to detain petitioner at least until March 2006, when they would review his status.  The record suggests that Russia declined ICE's second request to admit petitioner at the latest by January 16, 2006, (Mot. for Att'y Fees Ex. 4 at 14), although neither party brought this to my attention at the time.

---

[3]I determined that I had both subject matter and personal jurisdiction because petitioner brought the claim under a federal statute conferring jurisdiction, named the correct respondent, and sued in the right court.

3

On March 7, 2006, the date on which <u>Zadvydas</u>'s presumption of unconstitutionality took effect, respondents advised me that petitioner's mental condition and prior record justified his continued detention for at least a brief period of time and that they would not make a final decision concerning detention until the following week. On March 14, petitioner demanded that I order ICE to release him immediately, and on March 15, I conducted a telephone conference with counsel and ordered ICE to make a final decision within forty-eight hours. On March 17, respondents notified me that ICE had released petitioner.

## II. DISCUSSION

Under the "American Rule," parties generally bear their own litigation costs unless Congress specifically provides otherwise. <u>Alyeska Pipeline Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247 (1975). And prior to the EAJA's passage, even if a statute specifically authorized the recovery of costs, the federal government retained its common law immunity from suit unless the statute explicitly allowed recovery from the United States. <u>EEOC v. O & G Spring & Wire Forms Specialty Co.</u>, 38 F.3d 872, 881 (7th Cir. 1994) (citing <u>Alyeska</u>, 421 U.S. at 265-67).

The EAJA, first enacted in 1980 and made permanent in 1985, changed this scheme radically. The EAJA waives the United States's immunity from suit and makes it liable for fees and costs to the same extent as any other party. § 2412(b); <u>O & G Spring & Wire Forms</u>, 38 F.3d at 881. Further, the EAJA provides that a prevailing party other than the United States can recover fees and costs in any suit by or against the United States not covered by a more specific fee-shifting statute. Such provision states:

4

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action (other than cases sounding in tort) . . . brought by or against the United States . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

§ 2412(d)(1)(A). The EAJA further states that the "position of the United States" "means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based." § 2412(d)(2)(D). The Seventh Circuit has found that the purpose of the EAJA is three-fold: (1) to encourage private litigants to pursue challenges to government actions notwithstanding the cost of attorneys' fees; (2) to compensate parties for the cost of defending against unreasonable government action; and (3) to deter the government from prosecuting or defending cases in which its position is not substantially justified. Berman v. Schweiker, 713 F.2d 1290, 1297 (7th Cir. 1983).

In the present case, petitioner seeks to recover fees and costs under § 2412(d). Respondents argue that petitioner does not qualify for an award because the present action is not a "civil action," because petitioner is not a "prevailing party" and because the United States's position was "substantially justified." I address each of these arguments below.

**A.     Civil Action**

I ask first whether the phrase civil action encompasses a habeas corpus action and conclude that it does. The phrase civil action is unambiguous, and an action for habeas corpus is without question a civil action. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting) (stating that habeas corpus is neither an appellate

5

proceeding nor a criminal proceeding, "but rather an original civil action"); Cross v. Burke, 146 U.S. 82, 88 (1892) (stating that "[i]t is well settled that a proceeding in habeas corpus is a civil and not a criminal proceeding").

Contrary to O'Brien v. Byrd, 395 F.3d 499, 504 (4th Cir. 2005), and Ewing v. Rodgers, 826 F.2d 967, 969-70 (10th Cir. 1987), the fact that a habeas action is not a typical civil action does not make the phrase civil action ambiguous. Courts should not read into statutes exceptions that are not there. United States v. Wright, 48 F.3d 254, 256 (7th Cir. 1995). If Congress had intended to exclude habeas actions from the EAJA, it would have done so as it excluded tort actions. See § 2412(d)(1)(A). Further, excluding habeas actions from the EAJA would thwart at least two of the statute's purposes – deterring unjustified government action and compensating private parties who resist such action. See Berman, 713 F.2d at 1297. The unjustified detention of an individual is probably the most serious type of unjustified government action, and the EAJA contemplates that an individual subject to such action should be compensated for having to defend against it.[4]

Finally, even if the EAJA could be reasonably read as excluding habeas actions challenging criminal convictions, the same is not true of habeas actions challenging administrative detention. See Vacchio v. Ashcroft, 404 F.3d 663, 672 (2d Cir. 2005) (applying the EAJA to a habeas action challenging detention by ICE because the action

---

[4]In Ewing, the Tenth Circuit opined that it would be "absurd" to permit a millionaire who prevails in a habeas action to recover attorney fees. 826 F.2d at 970 n.3. However, the EAJA is not concerned with a party's wealth but rather with whether the government's action is justified. See § 2412(d)(2)(B) (permitting persons with net worths up to $2 million to access the EAJA).

6

was "both a civil action in its own right . . . and has its roots in a civil action"); In re Petition of Hill, 775 F.2d 1037, 1040-41 (9th Cir. 1985) (applying the EAJA to a habeas action challenging immigration-related detention); see also O'Brien, 395 F.3d at 507-08 (distinguishing Hill because it addressed habeas in the immigration context). Indeed, no circuit has found the EAJA inapplicable to habeas actions in the immigration context.

Thus, it cannot be reasonably disputed that the EAJA applies to a habeas action challenging immigration-related detention.

## B. Prevailing Party

Prior to 2001, all but one of the circuit courts considered a plaintiff who had been awarded relief by the court or whose suit had served as the catalyst for a voluntary change in the defendant's conduct, such as a settlement agreement, to be a prevailing party for the purpose of numerous fee-shifting statutes. See Buckhannon v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 601-02 (2001). In 2001, in a case dealing with the fee-shifting provisions of the Fair Housing Amendments Act of 1988 ("FHAA") and the Americans with Disabilities Act of 1990 ("ADA"), the Supreme Court rejected the "catalyst theory," holding that a plaintiff is a prevailing party only when she achieves some of the relief sought through a "court-ordered change in the legal relationship between the plaintiff and the defendant." Id. at 604 (internal quotations and citations omitted). The Court stated that a "defendant's voluntary change in conduct . . . lacks the necessary judicial imprimatur on the change." Id. at 605.

Relying on Black's Law Dictionary 1145 (7th ed. 1997), the Buckhannon Court indicated that prevailing party was a "legal term of art" referring to a party "in whose favor a judgment is rendered, regardless of the amount of damages awarded (in certain cases

7

the court will award attorney's fees to the prevailing party). Also termed successful party." Id. at 603. The Court expressed doubt that legislative history could overcome the phrase's "rather clear meaning," but nevertheless examined such history, finding it ambiguous at best and insufficient to alter the phrase's meaning. Id. at 607-08. The Court further expressed skepticism concerning the plaintiff's argument that the catalyst theory was necessary to prevent "mischievous defendants" from unilaterally mooting actions before court action in order to avoid fee awards. Id. at 608-09.

Although Buckhannon's holding applies only to the fee-shifting provisions of the FHAA and the ADA, the Court suggested in dicta that it applied to other statutes. Id. at 602-03. Thus, to determine whether plaintiff is a prevailing party within the EAJA, I must first address whether the phrase has the same meaning in the EAJA as the Buckhannon Court ascribed to it.

### 1. Applicability of **Buckhannon** to EAJA

The Seventh Circuit has indicated that district courts should exercise "great caution" before defining prevailing party differently than did the Buckhannon Court. T.D. v. LaGrange Sch. Dist. No. 102, 349 F.3d 469, 475 (7th Cir. 2003).[5] However, the court has stopped short of holding that Buckhannon applies to all prevailing party fee-shifting statutes, and "left open the possibility that the 'text, structure or legislative history' of a

---

[5]The Seventh Circuit has found Buckhannon to apply to at least four fee-shifting statutes: Dechert v. Cadle Co., 441 F.3d 474, 475 (7th Cir. 2006) (construing the Fair Debt Collection Practices Act); T.D., 349 F.3d at 476 (construing the Individuals with Disabilities Education Act); Fed'n of Adver. Indus. Representatives, Inc. v. City of Chi., 326 F.3d 924, 932 n.8 (7th Cir. 2003) (construing the Civil Rights Attorneys Fees Act of 1976); Crabill v. Trans Union, L.L.C., 259 F.3d 662, 666-67 (7th Cir. 2001) (construing the Fair Credit Reporting Act).

particular fee-shifting statute" might call for a different definition.  Id.; see also Palmetto Props., Inc. v. County of DuPage, 375 F.3d 542, 546 (7th Cir. 2004) (stating that Buckhannon "is conclusively presumed to so apply, absent a clearly contrary indication in the 'text, structure, or legislative history'").

The Seventh Circuit may have declined to close the door on the possibility that prevailing party could have a different meaning than in Buckhannon for several reasons. First, "prevailing" is not exclusively a legal term but also an ordinary word meaning succeeding or winning.  See Random House Webster's College Dictionary 1032 (1977); Webster's Third New Int'l Dictionary 1797 (1986).  Thus, it could be said to be ambiguous. See  Gaffney v. Riverboat Servs. of Indus., 451 F.3d 424, 446 n.20 (7th Cir. 2006) (stating that "report" has more than one meaning, citing the different definitions in Black's Law Dictionary and The American Heritage Dictionary of the English Language (4th ed. 2000), and thus looking to context for guidance).  Second, the Seventh Circuit has made clear that words in a statute should not be considered in isolation but rather in the context in which they appear.  Id. at 445-46; see also Firstar Bank, N.A. v. Faul, 253 F.3d 982, 990 (7th Cir. 2001) (stating that "before construing different statutes in pari materia, courts should take a hard look to ensure that the purposes of the acts are . . . similar").

An examination of the EAJA reveals its purpose and structure to be unique.  Most fee-shifting statutes permit a particular set of plaintiffs to recover fees in order to encourage them to vindicate specific rights.  See, e.g., T.D., 349 F.3d at 476 (construing the Individuals with Disabilities Education Act).  In contrast, the EAJA mandates that courts shift fees from individual plaintiffs to the government where the government's conduct has not been substantially justified, in order to "deter the unreasonable exercise of Government

9

authority." Ardestani v. INS, 502 U.S. 129, 138 (1991); see also Berman, 713 F.2d at 1295 (discussing differences between the EAJA and other statutes).  The EAJA shifts fees to the government when an agency engages in unjustified conduct, regardless of the agency's or the Department of Justice's handling of the ensuing litigation.  And it does not distinguish between plaintiffs and defendants, but between government agencies and officials and private litigants.  As the D.C. Circuit has stated, the EAJA is meant to discourage the federal government from using its superior resources unreasonably – "it is in this respect an 'anti-bully' law."  Battles Farm Co. v. Pierce, 806 F.2d 1098, 1101 (D.C. Cir. 1986), vacated, 487 U.S. 1229 (1988).

The EAJA's unique purpose and structure suggests that prevailing party may have a broader definition than that announced in Buckhannon.  See Firstar Bank, N.A., 253 F.3d at 990.  Thus, while presuming that Buckhannon controls, I explore whether the EAJA's "text, structure or legislative history" indicates to the contrary.  Palmetto Props., 375 F.3d at 546; T.D., 349 F.3d at 475.  And having done so, I conclude that the EAJA's legislative history incontrovertibly shows that the EAJA uses the term prevailing party in its ordinary sense, such that it encompasses the catalyst theory.

The Conference Committee that produced the EAJA stated that:

> [T]he phrase 'prevailing party' should not be limited to a victor only after entry of a final judgment following a full trial on the merits; its interpretation is to be consistent with the law that has developed under existing statutes.  A party may be deemed prevailing if he obtains a favorable settlement of his case, . . . if the plaintiff has sought a voluntary dismissal of a groundless complaint, . . . or even if he does not ultimately prevail on all issues.

H.R. Rep. No. 96-1431, at 21 (1980), reprinted in 1980 U.S.C.C.A.N. 5003, 5010.   This legislative history clearly demonstrates that the statute's authors assumed that prevailing

10

party would be defined broadly to include the catalyst theory. See Matter of Sinclair, 870 F.2d 1340, 1342 (7th Cir. 1989) (stating that legislative history may reveal "the setting of any enactment and the assumptions its authors entertained about how their words would be understood").

One court reading the quoted history focused on the statement that prevailing party is to be interpreted "consistent with the law that has developed under existing statutes," and construed it to mean that the term should be interpreted consistent with Buckhannon. Brickwood Contractors, Inc. v. United States, 288 F.3d 1371, 1379 (Fed. Cir. 2002). However, this seems an almost willful misreading of the paragraph. Read as a whole, the sentence in which the statement appears means that under the EAJA, as under existing law, a litigant need not win at trial to be a prevailing party. Further, the conferees directed that the EAJA be interpreted consistent with the law that "has developed" not with law that might develop in the future. They identified the law to which they referred, citing three cases that broadly defined prevailing party – Foster v. Boorstin, 561 F.2d 340, 342 (D.C. Cir. 1977), Corcoran v. Columbia Broadcasting System, Inc., 121 F.2d 575, 576 (9th Cir. 1941), and Bradley v. School Board of City of Richmond, 416 U.S. 696 (1974). Foster and Corcoran both relied on the catalyst theory, and they did so in particularly generous terms.[6]

_____

[6]In Foster, the D.C. Circuit found a Title VII plaintiff to be a prevailing party because her lawsuit prompted her employer to promote her, though the case had not advanced beyond the filing of the complaint. It noted that:

[i]f the government could avoid liability for fees merely by conceding the cases before final judgment, the impact of the fee provision would be greatly reduced. The government would remain free to assert boilerplate defenses, and private parties who served the public interest by enforcing the Act's mandates would be deprived of compensation for the undertaking. Thus, a general bar to awards of fees in cases resolved before final judgment cannot

11

Other legislative history shows that the definition of prevailing party found in the report of the Conference Committee was not "slip[ped] into the record late at night" by a self-serving member of Congress, <u>Intec USA, LLC v. Engle</u>, 467 F.3d 1038, 1042 (7th Cir. 2006), but that it accurately reflects the "rules of language" and assumptions behind the use of the term, <u>see</u> <u>Matter of Sinclair</u>, 870 F.2d at 1342 (discussing appropriate uses of legislative history).  The language of the report is identical to that in a report by the House Judiciary Committee.  H.R. Rep. No. 96-1418, at 11 (1980), <u>reprinted in</u> 1980 U.S.C.C.A.N. 4984, 4990.  Further, in 1985, the House Judiciary Committee issued a new report that took for granted that a private litigant who settled or who was sued by the government and voluntarily dismissed from a case was a prevailing party, stating that:

> [w]hen the case is conceded on the merits, dropped by the agency, or otherwise settled on terms favorable to the private party before any of the merits are heard, the court (or adjudicative officer) will again look to the record in the case to determine whether the position of the government was substantially justified.  The record in this instance will consist of the pleadings, affidavits and other supporting documents filed by the parties in both the fee producing and the case on the merits.

H.R. Rep. No. 99-120, at 13 (1985), <u>reprinted in</u> U.S.C.C.A.N. 132, 141-42.

And the Senate Judiciary Committee issued a report to the same effect, explaining that the EAJA's focus on the government's underlying position served Congress's intent that a settling litigant not receive a reduced fee award:

> The extent of government liability that would be incurred upon immediate surrender would ordinarily be minimal, i.e., the private party's fees for

be accepted by the court.

561 F.2d at 342.  In <u>Corcoran</u>, a copyright infringement action, the Ninth Circuit found that where a plaintiff voluntarily dismisses such an action, the party sued is the prevailing party. 121 F.2d at 576.

12

preparing a complaint (or answer) and supporting papers. Only where the government conducts a vigorous defense of an untenable agency action will the award be large.

    . . . .

    For its part, the government would have an added incentive to resolve disputes before the point at which the plaintiff is entitled to go to court. As it stands under the [rejected] alternative interpretation, the government has no such incentive; it can remain intransigent throughout the administrative process and hope that the individual is unwilling to undertake the expense of challenging its action in court. If the government loses its gamble and finds itself in court nonetheless, it can then simply give up at no cost whatsoever. Yet this is precisely the kind of bullying that Congress hoped to deter by enacting EAJA.).

S. Rep. 98-586, at 10-11 (1984).

    In addition, in adding a restrictive definition of prevailing party in eminent domain cases, the 1985 House Judiciary Committee report explained that the amendment distinguished between the definition of prevailing party in condemnation proceedings and its general EAJA definition. H.R. Rep. No. 99-120, at 18-19 (stating that the new definition would change "nothing in the definition of 'prevailing party' under other circumstances. The Act, as originally enacted, has an expansive view of the term 'prevailing party.'"); see also H.R. Rep. No. 98-992, at 15 (1984) (same).

    While courts should not attempt to ascertain the subjective intent of members of Congress through the use of legislative history, legislative history can advance judicial understanding of "'what Congress meant by what it said.'" Matter of Sinclair, 870 F.2d at 1343 (quoting Henry J. Friendly, Mr. Justice Frankfurter & the Reading of Statutes, in Benchmarks 218-19 (1967)). The above-quoted legislative history could not demonstrate more clearly that Congress meant to use prevailing party in its broad, ordinary sense, such that it encompasses the catalyst theory. And such history is highly trustworthy. It spans

five years, involves three different committees and both Houses of Congress, is comprehensive and internally consistent and illuminates an issue that was uncontroversial.[7]  See Louise L. Hill, Equal Access to Justice Act – Paving the Way for Legislative Change, 36 Case W. Res. L. Rev. 50, 58 n.45 (1985) (stating that "[i]t is undisputed that a party may be considered prevailing even if a case is settled or voluntarily dismissed").

The EAJA's broad definition of prevailing party reflects the statute's unique purpose and structure, as discussed above.  If prevailing party in the EAJA were defined as indicated in Black's Law Dictionary, see Buckhannon, 532 U.S. at 603, the EAJA would facilitate – rather than discourage – government bullying.  When a plaintiff sues the government, she often seeks only equitable relief.  In such circumstances, the government can litigate vigorously to wear down the plaintiff and then "tactically moot" the case, see Goldstein v. Moatz, 445 F.3d 747, 752 (4th Cir. 2006), prior to judicial action.  Cf. Buckhannon, 532 U.S. at 608 (stating that the concern about "mischievous defendants only materializes in claims for equitable relief").  And as the EAJA authorizes a fee award only where the government has engaged in unjustified conduct, it addresses circumstances in which the government may seek to conceal such conduct by litigating mischievously.

_____

[7]Other courts have examined and relied on the legislative history of the EAJA.  See, e.g., Scarborough v. Principi, 541 U.S. 401, 405-07, 417 (2004) (citing H.R. Rep. No. 96-1005, H.R. Rep. No. 99-120, and H.R. Rep. No. 96-1005 to support its conclusion regarding the EAJA's unique purpose); Comm'r v. Jean, 496 U.S. 154, 159 n.7 (1990) (citing H.R. No. 98-992, S. Rep. 98-586, and H.R. Rep. No. 96-1418 to support a similar conclusion); Berman, 713 F.2d at 1292 n.4, 1295-1300 (citing H.R. Rep. No. 96-1418 several times in its discussion of congressional intent).

Where the government is a plaintiff, the potential for bullying would be even greater were the catalyst theory unavailable. The government could initiate an action anticipating that the private party would capitulate. And if such party fought back, as the EAJA encourages her to do, the government could simply voluntarily dismiss the case and avoid a fee award no matter how unjustified its position. Congress was clearly concerned about just such a plaintiff. See H.R. Rep. No. 99-120, at 13 (stating that a private litigant can recover "[w]hen the case is conceded on the merits [or] dropped by the agency"); S. Rep. 98-586, at 10-11 (stating that if the government could simply give up its litigation position "at no cost whatsoever," then the EAJA could not prevent "precisely the kind of bullying" that the EAJA sought to discourage).

Finally, because of the EAJA's unique purpose and structure, Buckhannon's concern that the catalyst theory might produce inequitable results is inapplicable. Under the EAJA, only a prevailing party with a clearly meritorious position may obtain a fee award. § 2412(d)(1)(A) (barring an award where the government's position was "substantially justified"). Thus, the EAJA does not permit recovery by a party with a nonfrivolous but "nonetheless potentially meritless" claim or defense. See Buckhannon, 532 U.S. at 606. On this point, I refer to the following statement in Justice Scalia's concurrence:

> It could be argued, perhaps, that insofar as abstract justice is concerned, there is little to choose between the dissent's outcome and the Court's: If the former sometimes rewards the plaintiff with a phony claim (there is no way of knowing), the latter sometimes denies fees to the plaintiff with a solid case whose adversary slinks away on the eve of judgment. But it seems to me the evil of the former far outweighs the evil of the latter. There is all the difference in the world between a rule that denies the extraordinary boon of attorney's fees to some plaintiffs who are no less "deserving" of them than others who receive them, and a rule that causes the law to be the very instrument of wrong – exacting the payment of attorney's fees to the extortionist.

15

532 U.S. at 618 (Scalia, J., concurring). This "abstract justice" equation will always favor a successful EAJA claimant using the catalyst theory, as a court must necessarily find that the claimant is not an "extortionist," but rather a private individual whom the government has treated improperly.

In sum, I disagree with other courts that have considered the issue[8] and conclude that petitioner has overcome the presumption that <u>Buckhannon</u> controls the EAJA's definition of prevailing party.

### 2. Whether Petitioner is a Prevailing Party

Thus, I must find petitioner to be a prevailing party if (1) he succeeded on any significant issue, either as the result of a judicial decree or if his petition was a material factor in causing the government to provide relief voluntarily, and (2) his claim was not frivolous. <u>Jackson v. Chater</u>, 94 F.3d 274, 277 (7th Cir. 1996); <u>see also</u> <u>Hooper v. Demco, Inc.</u>, 37 F.3d 287, 292 (7th Cir. 1994). In the present case, petitioner clearly succeeded in obtaining the only relief he sought – his liberty. Further, I find that his petition for habeas corpus was a material factor in spurring the government to release him as early as it did. ICE had been less than scrupulous about releasing petitioner in a timely manner. Notwithstanding that Russia advised ICE that it would not accept petitioner, ICE continued to detain him after the 90-day removal period expired and beyond the six-month

---

[8]Several circuit courts have found that <u>Buckhannon</u> applies to the EAJA. However, they did so without analysis, <u>Goldstein</u>, 445 F.3d at 751; <u>Marshall v. Comm'r of Soc. Sec.</u>, 444 F.3d 837, 840 (6th Cir. 2006); <u>Vacchio</u>, 404 F.3d at 673; <u>Thomas v. NSF</u>, 330 F.3d 486, 492-93 (D.C. Cir. 2003), or with only cursory analysis, <u>Morillo-Cedron v. Dist. Dir. for the U.S. Citizenship & Immigration Servs.</u>, 452 F.3d 1254, 1258 (11th Cir. 2006); <u>Brickwood Contractors, Inc.</u>, 288 F.3d at 1379-80; <u>Perez-Arellano v. Smith</u>, 279 F.3d 791, 795 (9th Cir. 2002). I do not find these decisions persuasive.

16

presumption period, and respondents have never justified such detention under <u>Zavydas</u>. Respondents simply delayed review of the habeas petition until the burden of proof shifted to them. Even then, ICE did not release petitioner until I ordered respondents to make a final detention decision within forty-eight hours. Finally, not only was petitioner's claim for relief not frivolous, it was clearly meritorious under <u>Zavaydas</u> at least as of December 7, 2005, as I will discuss in connection with respondents' argument that the government's position was "substantially justified."

Even if <u>Buckhannon</u> applied to the EAJA, I would still find that petitioner is a prevailing party. The Seventh Circuit has discussed <u>Buckhannon</u> in a number of cases. In <u>Palmetto Properties</u>, 375 F.3d at 548-49, the district court found a section of a municipal ordinance unconstitutional but delayed entry of judgment to enable the municipality to repeal the offending section and, when it did, dismissed the case as moot. The Seventh Circuit concluded that the court's action was sufficient to satisfy <u>Buckhannon</u>, as the court's action effected a judicially-sanctioned change in the parties' relationship. The Seventh Circuit added that denying fees would "contradict <u>Buckhannon</u>'s logic, create an inequitable result and promote inefficiency" as well as "elevate form over substance." <u>Id.</u> at 550-51. In <u>Claiborne v. Wisdom</u>, 414 F.3d 715, 719 (7th Cir. 2005), the Seventh Circuit found a district court's order of dismissal subsequent to the plaintiff's withdrawal of her claims sufficient to justify an EAJA award. The Seventh Circuit has also indicated that a settlement short of a consent decree could effect a judicially-sanctioned change in the parties' relationship if, "for instance, the terms of the settlement were incorporated into the dismissal order and the order was signed by the court rather than the parties, or the order provided that the court would retain jurisdiction to enforce the terms of the settlement."

17

Petersen v. Gibson, 372 F.3d 862, 866-67 (7th Cir. 2004). However, a settlement is not a judicially-sanctioned change simply because the judge conducted the conference that precipitated it and made settlement suggestions. Id.

Thus, to satisfy Buckhannon, the Seventh Circuit requires that a court take some formal action that changes the legal relationship of the parties. In the present case, this requirement is met. The March 15 order directing respondents to make a final determination concerning petitioner's release within forty-eight hours was a formal judicial action. Moreover, after detaining petitioner for months without even asserting that his removal was reasonably forseeable, respondents complied with the order and thus changed petitioner's legal status. Respondents suggest that ICE would have released petitioner anyway, and the fact that the order may have only "speeded up" his release, (Resp't's' Br. in Opp'n to Mot. for Fees at 12, 14, 15), does not satisfy Buckhannon. I disagree. Even if the order caused ICE to release petitioner one day earlier than it otherwise would have, it effected a change in the legal relationship between the parties.

For the foregoing reasons, whether or not Buckhannon applies, petitioner has established that he is a prevailing party under § 2412(d).

## C.    Substantially Justified

The government's position is substantially justified if it is "'justified in substance or in the main' – that is, . . . to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Webster's New International Dictionary at 2514 (2d ed. 1945)). The position need not be "justified to a high degree," but must be "more than merely undeserving of sanctions for frivolousness." Id. at 565-66. In determining whether the government's position is substantially justified, I consider both the

18

agency decision which gives rise to the lawsuit and the government's posture during the litigation. <u>Cummings v. Sullivan</u>, 950 F.2d 492, 497 (7th Cir. 1991). The government bears the burden of proving that its position is substantially justified. <u>Id.</u> at 495.

Respondents' initial litigation position that the Seventh Circuit's consideration of petitioner's first habeas petition deprived me of jurisdiction was reasonable, although it was not meritorious. In addition, respondents' initial position that <u>Kim</u> permitted ICE to detain petitioner pending a final order of removal was reasonable, although it may not have been meritorious inasmuch as Russia declined to admit petitioner long before the BIA issued such order.

However, a court only makes one determination of substantial justification under the EAJA, and it is clear that petitioner's detention through March 17, 2006, was not substantially justified. <u>See</u> <u>Cummings</u>, 950 F.2d at 497 (stating that a court considers the justification for the underlying agency action). As of December 7, 2005, when the removal period expired, <u>Zadvydas</u> governed petitioner's detention. And under <u>Zadvydas</u>, to establish that ICE lawfully detained petitioner beyond that date, respondents must show that it was reasonably foreseeable that ICE would be able to remove petitioner. Respondents contend that they must only justify detention beyond March 7, 2006 – six months after the final order of removal. However, respondents misread <u>Zadvydas</u>. That case does not authorize ICE to detain an alien for six months after a final order of removal regardless of the alien's removability. Rather, it holds that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." <u>Id.</u> at 699. The six-month period is significant because after six months detention is <u>presumed</u> unconstitutional.

19

Regardless, respondents have not met their burden of establishing substantial justification. Petitioner presented evidence with his petition that he could not be removed to Russia. Though the burden of proof remained with petitioner until March 7, 2006, respondents never even asserted that removal was nevertheless reasonably foreseeable. ICE made a second request to Russia to admit petitioner in December; however, the record indicates that Russia rejected the request no later than January 16, 2006. (See Mot. for Att'y Fees & Costs Ex. 4 at 14). And even in their letter dated March 7, 2006, respondents failed to assert that removal was reasonably foreseeable, but rather stated that ICE continued to detain petitioner because of his mental health and criminal record; as discussed, these concerns did not justify continued detention under Zadvydas. Beyond that date, ICE detained him for an additional ten days – until I ordered the agency to take action. Thus, it is clear that the government's position was not substantially justified.

### III. CONCLUSION AND AWARD

For the reasons stated, petitioner is a prevailing party in a civil action, and the United States's position was not substantially justified. Therefore, he is entitled to an award of fees and costs under the EAJA.

Section 2412(d)(2)(A) allows for "reasonable attorney fees . . . based upon prevailing market rates for the kind and the quality of the services furnished" not to exceed "$125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." Petitioner must establish that the number of hours expended on the litigation was reasonable. See Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). In assessing reasonableness, I consider twelve factors:

20

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. at 430 n.3.

In the present case, the number of hours that petitioner's attorneys spent on the litigation was reasonable under Hensley, as respondents appear to concede.  Petitioner seeks an hourly rate higher than that established by the EAJA based on his contention that the prevailing rate for immigration attorneys with the qualifications possessed by his counsel is higher.  He requests an hourly rate of $250 for attorneys Baldini-Potermin and Pollock, a rate of $185 for attorney Relias, and $85-100 per hour for legal assistants.  Thus, he seeks a total award of $35,627.85, consisting of $33,975.50 in fees and $1,652.35 in costs.  Respondents dispute that such increased rates are justified.

Although I am authorized to set higher rates, see, e.g., Muhur v. Ashcroft, 382 F.3d 653, 656 (7th Cir. 2004), I decline to do so in the present case.  This was a relatively straightforward habeas case, which did not require significant specialized knowledge but only a careful reading of two recent Supreme Court cases.  Thus, I will set the hourly rate for attorneys Baldini-Potermin, Pollock and Relias at the $125 statutory rate.[9]  As such, I will award petitioner attorneys' fees in the amount of $21,275.25.  With costs, the award is $22,927.60.

**Therefore,**

_____

[9]Petitioner did not argue for an increased rate based on inflation.

**IT IS ORDERED** that petitioner's motion for fees and costs is **GRANTED IN THE AMOUNT OF $22,927.60**.

**IT IS FURTHER ORDERED** that Arkadiy L. Kholyavskiy's petition for a writ of habeas corpus is **DISMISSED AS MOOT**.

Dated at Milwaukee, Wisconsin this 9 day of February, 2007.


/s_____
LYNN ADELMAN
District Judge